## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALAN VALENTIC,            )
                                    )
           Plaintiff,       )   Civil Action No. 21-1789
                                    )
      v.                 )
                                    )
THE BROCK GROUP, INC., BROCK   )
INDUSTRIAL SERVICES, LLC,     )
                                    )
          Defendants.

## <u>MEMORANDUM OPINION</u>

Plaintiff Alan Valentic ("Valentic") worked as an insulator for Defendants the Brock Group, Inc. and Brock Industrial Services, LLC ("Brock"), at a time when Brock was a subcontractor on a major construction project in Western Pennsylvania, hereinafter referred to as the "Shell Cracker Plant" or "the Project." Valentic—in a suit that he originated in the Court of Common Pleas of Allegheny County that has since been removed to this Court—alleges that Brock violated the Pennsylvania Minimum Wage Act ("PMWA") by failing to pay him and similarly situated employees for time that they spent getting themselves to and from a drop-off point known as the "Kiss & Drop" or parking lots provided by the general contractor, and their jobsites. Presently before the Court is Valentic's Motion to Certify Class (Docket No. 57) wherein he asks the Court to allow him to represent a class in this litigation of "[a]ll non-exempt employees presently or formerly employed by [Brock] at the … Shell Cracker Plant … at any time during the period from November 3, 2018, through the present, who worked forty hours or more in at least one work week." *Id.* Valentic's motion is opposed by Brock. (Docket No. 61). The Court has considered the parties' arguments on the motion, as well as their supporting exhibits. (Docket Nos. 58-59, 62, 65, 69). For the reasons explained herein, the Court will <u>grant</u> Valentic's motion <u>in part</u> and certify a class of persons which is slightly narrower than the class he proposes.

1

## I.    **BACKGROUND**

Valentic is an insulator and member of Local No. 2 of the International Association of Heat and Frost Insulators and Allied Workers.  (Docket No. 59-5).  He was employed by Brock as an insulator at the Shell Cracker Plant Project from January 25, 2021, to February 25, 2022.  (*Id.*).  During that time, Valentic was not permitted to park on the premises of the Shell Cracker Plant; instead, if he drove, he was permitted to park his vehicle at one of several offsite parking lots where he could take a bus provided by the Project's general contractor to the Shell Cracker Plant.  (*Id.*).  Valentic exercised this option to drive and park his vehicle at one of the lots.  For the first eight or nine months of his time working at the Shell Cracker Plant, he was directed to park at the Blue Lot.  After that, he was directed to park at the Green Lot, which was closer to the Shell Cracker Plant.  (*Id.*).  Valentic observed that "most of [his coworkers] … parked and took the bus each day." (*Id.*).  Herein, the Court refers to such employees as employees who exercised the "park & ride" option.  In addition to the park & ride option, workers at the Shell Cracker Plant could have someone—family, an acquaintance, or a taxi-type service—drop them off at a point next to the Shell Cracker Plant referred to as the Kiss & Drop.  (*Id.*).  Valentic did not exercise the Kiss & Drop option.

When Valentic arrived each day at the parking lots, he scanned a security badge at the lot, waited for about fifteen minutes to board a bus, and then rode the bus to an entry point at the Shell Cracker Plant.  The bus ride from the Blue Lot took between twenty and thirty minutes.  (*Id.*).  The bus ride from the Green Lot took between five and ten minutes.  Once the park & ride bus dropped Valentic off, Valentic scanned his security badge for the second time to enter the lunch tents.  (*Id.*).  Valentic donned his personal protective equipment ("PPE") in the lunch tent, which took him about ten minutes.  (*Id.*).  His PPE included a hard hat, safety glasses, gloves, a long sleeve shirt, a high

visibility vest, a harness, steel-toed boots, and (sometimes) fire retardant jumpsuits. (*Id.*). Valentic has represented to the Court that he donned his PPE in the lunch tents, which is consistent with other evidence in the record indicating that doing so was permissible. There is also evidence in the record indicating that Brock employees were permitted to don their PPE at home, that is, they were not required to wait to don their PPE on the Project premises. (Docket. No. 62-3). Regarding employees who used the Kiss & Drop, they scanned their security badges at the Kiss & Drop before walking or shuttling[1] to the lunch tents, the walk being approximately ten minutes. (Docket No. 62-2). Once at the lunch tents, they, like employees who used the park & ride, scanned their security badges a second time to enter the lunch tents. After the lunch tents, Valentic and his coworkers walked to their jobsites at the Shell Cracker Plant. The distance of the walk from the lunch tents to jobsites differed depending on job assignment, but generally took seven to fifteen minutes. (Docket No. 59-5). Valentic has indicated that he was expected to arrive at his assigned jobsite five-to-ten minutes before the start of his shift.

Valentic's shift at the Shell Cracker Plant began at 7:00 a.m. Monday to Friday. (*Id.*). His shift ended at 5:30 p.m. Monday to Thursday, and 3:30 p.m. on Fridays. (*Id.*). Valentic and others were permitted to stop work as early as 4:50 p.m., *i.e.*, forty minutes prior to the end of their paid shift, to, among other things, return to the lunch tents to store PPE.[2] Returning to the lunch tents took about ten minutes, and Valentic and other park & ride and Kiss & Drop employees generally had to wait three to five minutes to scan their security badges on the way out of the lunch tents at

---

[1]     Docket No. 59-1 at 24.

[2]     There is conflicting evidence in the record regarding exactly how much time Brock employees had at the end of the day to wrap up their work before their end of their paid shift. Brock represents that workers were permitted to conclude work at 5:00 p.m. but that they were paid until 5:30 p.m. (Docket No. 61 at 6). In other places in the record, the Court is told that work stopped at 4:50 p.m. (Docket No. 62-5 at 3).

that time.  After swiping out for the day, Valentic boarded a bus to return to the Blue Lot (a twenty-to-thirty-minute ride) or the Green Lot (a five-to-ten-minute ride) while Kiss & Drop employees walked the ten minutes back to the drop-off point for their rides.  Valentic usually arrived at the parking lots between ten and thirty-five minutes past the end of his scheduled shift.  (*Id.*).  For those employees who were particularly delayed in getting back to the parking lots because they missed the first wave of buses, those employees could call their foreman to request compensation for the time they spent waiting for a second wave of buses.  (Docket No. 62-4).

The typical schedule worked by Valentic and others provided for forty-eight hours of work weekly (after accounting for a thirty-minute unpaid meal period daily).  Valentic was compensated for those forty-eight hours, but he argues he should have been paid more for the significant time he spent getting to his jobsite in the morning and getting back to his vehicle in the afternoon, that is, the time before 7:00 a.m. and after 3:30/5:30 p.m. that he spent getting to his jobsite and returning to his vehicle from his jobsite.  Valentic argues that the time he and other Brock employees spent on this pre- and post-shift work constituted hours worked that ought to have been compensated under the PMWA.  (Docket No. 1-1, ¶¶ 38-46).  To remedy Brock's alleged PMWA violations, Valentic filed suit, and Brock thereafter removed the case to this Court pursuant to 28 U.S.C. § 1446(b), asking this Court to exercise its jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) where Valentic is a citizen of Pennsylvania, Brock is a citizen of Delaware and Texas, and the amount in controversy exceeds $75,000.  (Docket No. 1).

After Brock answered Valentic's pleadings before the Court (Docket Nos. 7-9), the Court ordered among other things, that class certification discovery be completed by October 10, 2022.  (Docket No. 15).  The Court indicated at that time that upon completion of class certification discovery and receipt of Valentic's motion for class certification—as well as any memorandum in

4

opposition to certification that might be filed by Brock—the Court would rule on the class certification motion and then set a schedule for remaining adjudication of the case. (*Id.*).[3] The parties thereafter asked for several extensions of time to complete class certification discovery. (Docket Nos. 48, 50, 52). The final extension gave the parties until January 19, 2024, to complete class certification discovery. (Docket No. 52). Since that time, Valentic filed his motion for class certification and Brock filed its opposition to the motion. The matter is now ripe for decision.

## II.    STANDARD FOR CLASS ACTION CERTIFICATIONS

The class action is a "procedural innovation that enables persons who have suffered a wrongful injury, but are too numerous for joinder of their claims alleging the same wrong committed by the same defendant or defendants to be feasible, to obtain relief as a group...." *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 482 (3d Cir. 2018) (quoting *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014)). "In order for the Court to certify [a] proposed class under Federal Rule of Civil Procedure 23, the [plaintiff] must demonstrate by a preponderance of the evidence that the 'four threshold requirements' delineated in Rule 23(a) are met." *Swank v. Wal-Mart Stores, Inc.*, No. 2:13-CV-1185, 2018 WL 2684102, at *3 (W.D. Pa. June 5, 2018); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 315-16 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (explaining that the proponent of the class must prove the "factual determinations necessary for class certification" by a preponderance of the evidence). The four requirements of Rule 23(a) are: "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *Id.* (quoting *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016)). Courts employ a "rigorous analysis" to ensure that the "explicit requirements set forth in

---

[3]    The Court also referred the case to mediation at that time. (Docket No. 17). The parties reported on the results of mediation on May 19, 2023, indicating that the case had not been resolved. (Docket No. 44).

Rule 23(a) are satisfied," which sometimes requires "mak[ing] factual findings and legal conclusions that overlap with the underlying merits of the suit." *Mielo*, 897 F.3d at 482.

If a proponent of class certification satisfies the criteria of Rule 23(a) set forth above, *then* he or she "must also establish that [his or] her claim fits within one of the three types of class categories outlined in Rule 23(b)." *Mielo*, 897 F.3d at 482. In this matter, Valentic seeks certification under Rule 23(b)(3). The criteria of Rule 23(b)(3) require that the proponent of class certification shows that "questions of law or fact common to class members predominate over any questions affecting only individual members," and, further, "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Several items that are "pertinent to these findings include": "the class members' interests in individually controlling the prosecution or defense of separate actions"; "the extent and nature of any litigation concerning the controversy already begun by or against class members"; "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and "the likely difficulties in managing a class action." *Id.* "[T]he predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Swank*, 2018 WL 2684102, at *5 (quoting *Taha v. Cty. of Bucks*, 862 F.3d 292, 308 (3d Cir. 2017)). "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998) (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996)) (cleaned up). Rule 23(b)(3) further requires ascertainability, which "ensures that a proposed class will actually function as a class." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015), *as amended* (Apr. 28, 2015); *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469 (3d Cir. 2020).

III.    **DISCUSSION**

In his motion and brief to certify a class that includes himself and other nonexempt Brock employees who worked more than forty hours in a week during the relevant time at the Shell Cracker Plant, Valentic argues that he can show by a preponderance of the evidence that he meets the criteria for class certification in Rules 23(a) and 23(b)(3). The Court considers the arguments and evidence pertinent to the Rule 23(a) and Rule 23(b)(3) criteria herein.

A.    Numerosity

For Rule 23(a)'s numerosity requirement, the Court asks whether the potential members of a proposed class are "so numerous that joinder of all members is impracticable." *Mielo*, 897 F.3d at 484 (quoting Fed. R. Civ. P. 23(a)(1)). There is no minimum number of putative class members needed for class certification. The Third Circuit Court of Appeals has held that the numerosity requirement is generally satisfied when "the potential number of plaintiffs exceeds 40." *Id.* at 486 (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)); *Allen v. Ollie's Bargain Outlet, Inc.,* 37 F.4th 890, 896 (3d Cir. 2022) ("We presume joinder is impracticable when the potential number of class members exceeds forty. This is a guidepost: showing the number of class members exceeds forty is neither necessary nor always sufficient.").

In support of the motion to certify class, Valentic identifies evidence in the record showing that there are approximately 750 individuals who would fall within the parameters of his proposed class. He cites Jayson Wright's ("Wright") deposition wherein Wright, another Brock employee at the Shell Cracker Plant, indicated that there were "approximately 750 insulators" employed by Brock on site during the time Wright was a project manager there (mid-2021 to mid-2022). (Docket No. 59-1 at 18, 22). According to Wright, despite significant turnover, Brock usually employed approximately 750 insulators, as well as what computes to about eighty carpenters. (*Id.*

at 21).  The Court is satisfied that this evidence is adequate to show that the proposed class is sufficiently numerous where, even if the class is narrowed, it would still significantly exceed forty members.  *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 357 (3d Cir. 2013) (explaining that evidence of numerosity cannot be speculative).

Brock argues that Valentic fails to marshal evidence to show that the proposed class members engaged in the same activities that underlie his PMWA claim.  That is, Brock argues Valentic cannot show that the 750+ individuals who would be part of his proposed class performed the same pre- and post-shift activities—like riding to and from parking lots—as Valentic.  Therefore, Brock argues, under *Mielo* the Court should not find numerosity.  In *Mielo*, two plaintiffs alleged they personally experienced difficulty ambulating in their wheelchairs at two sloped parking facilities at Steak 'n Shake restaurants in Western Pennsylvania and sought to represent a putative class of all physically disabled individuals who may have experienced similar difficulties at Steak 'n Shakes throughout the country.  The Third Circuit decided that numerosity was lacking where plaintiffs asked the court to speculate that out of millions of disabled individuals in the United States it must have been "highly likely" that a sufficiently numerous subset of such persons experienced Americans with Disabilities Act (ADA) violations at Steak 'n Shake restaurants across the country.  897 F.3d at 486-87.  However, *Mielo* is distinguishable.  In this matter, there is evidence in the record showing that, because most workers at the Shell Cracker Plant were not permitted to park onsite at the Project, the Project's general contractor employed park & ride and Kiss & Drop options to make it possible for workers to access their jobsites.  (*See e.g.*, Docket No. 59-2 at 2, Deposition of Luke C. Wolfe (Q: "So there was no way to create like a parking lot for thousands and thousands of people right at the Shell Cracker Plant?"  A: "That is correct.").  Valentic stated in his declaration that it was his "understanding from observing and

talking to [his] coworkers … that most of them, like [him], parked and took the bus each day." (Docket No. 59-5 at 3). There is some evidence in the record that a subset of employees were permitted to park onsite at the Shell Cracker Plant, *see infra*, but on the whole the evidence in this record supports a finding that well over forty Brock employees shared Valentic's experience, accessing and leaving their jobsites via the park & ride or Kiss & Drop. Unlike the proposed class in *Mielo*, the size of Valentic's proposed class is not derived by speculation but is comprised of identifiable and quantifiable employees discernable from Brock's payroll records and jobsite security scan records. Accordingly, the Court finds that Valentic has made a satisfactory showing of numerosity for purposes of class certification.

        B.      <u>Commonality & Predominance under Rule 23(b)(3)</u>

For Rule 23(a)(2)'s commonality requirement, the Court asks what sounds like a simple enough question: are there "questions of law or fact common to the class." But this requirement, however simple, is not perfunctory, and courts have cautioned that the commonality requirement cannot be read too broadly because "any competently crafted class complaint literally raises common questions." *Mielo*, 897 F.3d at 487 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)). For that reason, it is helpful to bear in mind the goal of commonality, which is to determine whether there is a possibility that one proceeding will produce answers that are *universally applicable* to the class and therefore expediently and efficiently drive many claims forward toward resolution. *In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 398 (3d Cir. 2015) ("What matters to class certification ... is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." (quoting *Dukes*, 564 U.S. at 350)).

In cases like this one—wherein a plaintiff invokes Rule 23(b)(3) as the basis of a motion for class certification—the commonality requirement in Rule 23(a)(2) is incorporated into the more demanding Rule 23(b)(3) predominance requirement. *Nat'l Football League Players Concussion*, 821 F.3d at 434 ("We have previously noted that the Rule 23(b)(3) predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement." (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004))); *Hydrogen Peroxide*, 552 F.3d at 310-11. The predominance requirement demands that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.* (quoting Fed. R. Civ. P. 23(b)(3)); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015) ("If issues common to the class overwhelm individual issues, predominance should be satisfied"). In *Hydrogen Peroxide*, the Third Circuit explained that whether a question "is common or individual" can usually be discerned by how it will be ultimately proved. 552 F.3d at 311 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). Thus, the predominance requirement calls, to an extent, for a "prediction" by the district court regarding "how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Id.* (quoting *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)). To make such a prediction, district courts can look at the elements of a claim to determine whether they can be satisfied by common evidence. *Id.* (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001), *as amended* (Oct. 16, 2001)).

There is one claim in this case: that Brock violated the PMWA by failing to pay Valentic and others in the proposed class for all compensable work activities performed beyond forty hours weekly. The elements of a PMWA claim are: (1) that the plaintiff was an employee, (2) the

defendant was the plaintiff's employer, and (3) the employer failed to pay the plaintiff for all wages required under the PMWA. *Beauregard v. Broadway Elec. Serv. Corp.,* No. 2:21-CV-1600, 2022 WL 2293969, at *7 (W.D. Pa. June 24, 2022). The third element is disputed here, *i.e.*, whether Valentic (and others) could prove having worked "forty hours of work in a given workweek as well as some uncompensated time in excess of the forty hours." *Id.* at *5 (quoting *Bansept v. G&M Auto.*, 434 F. Supp. 3d 253, 258 (E.D. Pa. 2020)).

Valentic argues that questions and evidence concerning whether the pre- and post-shift time for which Valentic seeks compensation was compensable time under the PMWA predominate. An essential question relevant to the claims of all members of the putative class will be whether such pre- and post-shift time getting to and returning from jobsites is compensable time under the PMWA. Valentic acknowledges that the extent of each class member's injury may be different and that the amounts of damages will therefore differ by individual member of the putative class. But, Valentic argues that such differences in the quantity of damages owed to members of a class does not defeat class certification. (Docket No. 58 at 19 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). In *Tyson Foods*—on which Valentic relies—the Supreme Court stated that predominance is about determining whether common questions are "more prevalent or important" than individual questions. *Id.* (citation omitted). The *Tyson* court went on to explain that if "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, *such as damages* or some affirmative defenses peculiar to some individual class members." *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-124 (3d ed. 2005)) (emphasis added). A central issue that will predominate in this matter is whether the pre- and post-shift

activities described by Valentic constitute "hours worked" under the PMWA, particularly for those employees who, like Valentic, could not directly access the Shell Cracker Plant.

The PMWA does not itself define hours worked, but the Pennsylvania Department of Labor and Industry defines "hours worked" by regulation in 34 Pa. Code § 231.1.  According to that definition, "hours worked" under the PMWA includes the following:

> time during which an employee is required by the employer to be on the premises of the employer, to be on duty or to be at the prescribed work place, time spent in traveling as part of the duties of the employee during normal working hours and time during which an employee is employed or permitted to work; provided, … that time allowed for meals shall be excluded unless the employee is required or permitted to work during that time, and provided further, that time spent on the premises of the employer for the convenience of the employee shall be excluded.

34 Pa. Code § 231.1.  As indicated therein, the only times excluded from "hours worked" are mealtimes and time spent on work premises "for the convenience of the employee."  *Id.*  The Pennsylvania Supreme Court recently addressed the PMWA's definition of "hours worked" at length in *In re Amazon.com, Inc.*, a case in which Amazon warehouse employees sought pay for time they spent going through mandatory anti-theft security screenings before they left the premises at the end of their shifts.  255 A.3d 191 (Pa. 2021).  In that case, the Pennsylvania Supreme Court explained that the PMWA could go further than the Fair Labor Standard Act (FLSA) in determining which work activities are compensable.  *Id.* at 201 ("[I]n addressing the question before us – whether the time these employees were required to spend on Amazon's premises as a result of the security screening process constituted 'hours worked' – we are not bound by the United States Supreme Court's decision … address[ing] the FLSA, and its [Portal-to-Portal[4]] amendments.").  The Pennsylvania Supreme Court ultimately determined that because

---

[4]    *See* 29 U.S.C. § 254(a).  Congress enacted the Portal-to-Portal Act ("PPA") in 1947 "in response to a United States Supreme Court decision holding that time spent by employees walking from timeclocks

Amazon *required* employees to be on their warehouse premises for security screenings, that time constituted "hours worked" under the PMWA. *Id.* at 204. Additionally, the Pennsylvania Supreme Court held that there is no "*de minimis* exception to the PMWA's irreducible requirements" and that the PMWA "unambiguously requires payment for 'all hours worked.'" *Id.* at 208–09.

Valentic has shown in this matter that—at least as far as he and other employees who had no direct access to the Shell Cracker Plant and, therefore, utilized the park & ride or the Kiss & Drop are concerned—there are common questions of law and fact for which it would be most efficient to address them together. Therefore, the Court concludes that the question of whether using the park & ride or Kiss & Drop, with their associated wait, walking, and overall travel times, constitutes "hours worked" pursuant to the PMWA is a legal question common to nearly everyone in Valentic's proposed class, and the Court will herein explain why, in arriving at this decision, it is necessary to carve out those Brock employees who had direct access to the Shell Cracker Plant. According to evidence in the record, it is possible that Brock employees spent as many as seventy minutes between arrival at the parking lot and arrival at the jobsite, and as many as forty-five minutes returning to the parking lot in the afternoon.[5] For Kiss & Drop employees, the time between an employee swiping his or her security badge at the Kiss & Drop and arriving at a jobsite

---

near a factory entrance to their work stations was compensable time at work," *Sec'y United States Dep't of Lab. v. Nursing Home Care Mgmt. Inc.*, 128 F.4th 146, 154 (3d Cir. 2025) (discussing *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680 (1946)), thus eliminating liability for employers who do not compensate employees for time spent "walking, riding, or traveling to and from the actual place of performance of the employee's principle activity or activities" and doing "activities which are preliminary to or postliminary to said principal activity or activities." *Id.* at 154-55 (quoting 29 U.S.C. § 254(a)). The Pennsylvania Supreme Court in *Amazon* noted that the FLSA and PPA merely establish a national floor for wage protections and that states may supply more generous protections such as those provided by the PMWA. 255 A.3d at 201.

[5]     On the low end—particularly for employees who were parked in closer lots like the Green Lot—the time getting to a jobsite could have been as short as seventeen minutes, and the time coming back to the parking lot at the end of the workday could have been as short as eighteen minutes.

could take as long as thirty-five minutes and the time returning to the Kiss & Drop could take as long as twenty-five minutes. Whether Brock's failure to compensate its employees for all such time was a PMWA violation is a common question, the answer to which is apt to drive the resolution of the PMWA claims that might be brought by individual members of Valentic's proposed class.

Brock contends that Valentic has not established predominance and that the proposed class members' claims are widely divergent in the same way that the potential class members' claims were too heterogenous in *Mielo*. Common evidence could not be applied to these claims in *Mielo*, so the Third Circuit Court of Appeals explained that even though all class members might allege a violation of the same provision of the ADA, they would likely do so in significantly different ways. 897 F.3d at 490. The court explained, for instance, that one member of the class "might allege that Steak 'n Shake violated the ADA by failing to replace inaccessible door hardware" and another might allege that Steak 'n Shake failed "to replace inaccessible water fountains." *Id.* Accordingly, the Third Circuit found that the claims were best pursued individually. *Id.* Brock argues this case is the same as in *Mielo* because putative class members were not required to use the park & ride services. Similarly, Brock points out that part of Valentic's claim is for time he says was spent donning and doffing PPE, but because Brock employees were not required to don/doff PPE onsite as opposed to at home, that aspect of the case injects individual questions about whether time certain Brock employees spent at the Shell Cracker Plant for their own convenience would not count as hours worked. Therefore, Brock argues, because things like using the park & ride services, the Kiss & Drop, and/or donning/doffing PPE in the lunch tents were neither mandatory nor uniform, there is no common factual thread connecting the theories of liability among the class. Brock further argues that the evidence shows that it paid its employees

in the class until 5:30 p.m. even though they ceased work operations at between 4:50 and 5:00 p.m., meaning class members were paid for time when they were not working and that this time would have to be individually accounted for and might subsume some or all the class members' claims.

The Court is not persuaded by the argument that Valentic has failed to establish predominance and commonality.  In the Court's view, there are common questions of fact and law that are prevalent and important enough to outweigh individual issues.  The legal question in common is whether the time Brock employees spent using the park & ride services or Kiss & Drop in accessing their jobsites, and then returning to their vehicles and/or rides at the end of the day, constitutes "hours worked" under the PMWA.  From the record, it appears that Brock's policy was to pay for as many as forty minutes of time that it took employees to wrap up at the end of the day, but not for time beyond those forty minutes except if an employee utilizing the park & ride services missed the first wave of buses.  Whether that policy lawfully compensates these employees is a common question affecting individual claims of potential class members, and it is the kind of question that satisfies the predominance inquiry.  For instance, in *Koenig v. Granite City Food & Brewery, Ltd.*, a restaurant employee filed suit for violations of the PMWA, specifically, that her employer "(1) fail[ed] to meet tip credit notification requirements; (2) fail[ed] to pay tipped employees full minimum wage when they performed non-tipped work; (3) claim[ed] a tip credit in excess of amounts permitted by Pennsylvania law; and, (4) forc[ed] tipped employees to forfeit tips when customers walked out or the employee had a cash shortage."  2017 WL 2061408, at *1 (W.D. Pa. May 11, 2017).  In that case, the court decided that even though "certain tipped positions may have different factual claims," "predominant questions of fact and law for the class relate to how [the employer] notified tipped employees of the tip credit and calculated all tipped employees'

minimum wage." *Id.* at \*5. Because the employer "used the same policies and procedures for all tipped employees" and they shared "the same cause of action" under the PMWA, predominance was satisfied. *Id. See also Garcia v. Vertical Screen, Inc.*, No. CV 18-4718, 2022 WL 282541, at \*3 (E.D. Pa. Jan. 31, 2022) ("[W]here employees allege an improper practice by their employer that was formulated centrally and resulted in uncompensated overtime, the need for individualized damages does not defeat a finding that Plaintiffs are similarly situated" for purposes of the FLSA (internal quotation marks and citations omitted)). Accordingly, for the foregoing reasons, the Court finds that predominance and commonality are satisfied here.

That said, as the Court indicated above, the Court will narrow Valentic's proposed class to ensure commonality and predominance insofar as the evidence indicates at least some Brock employees were permitted to park onsite at the Shell Cracker Plant, or otherwise access it directly through others who had permission to park onsite. (Docket No. 62-2, ¶ 14, Declaration of Luke Wolfe ("I have also personally observed or have personal knowledge of BIS hourly, non-exempt employees riding with BIS' Superintendents onsite.")). When the Court rules on a motion for class certification, it is "not bound by [the] proposed class definition and has broad discretion to redefine the class, whether upon motion or *sua sponte.*" *Vaccaro v. Amazon.com.dedc, LLC*, No. CV 18-11852 (GC) (TJB), 2024 WL 4615762, at \*12 n. 6 (D.N.J. Oct. 30, 2024). In this case, the common legal and factual threads running through Valentic and the proposed class members' claims are that they were afforded only up to forty minutes' compensation for pre- and post-shift activities that sometimes—if not often or always—took longer than forty minutes. The evidence in the record supporting those common legal and factual threads pertain to Brock employees' use of the park & ride systems or the Kiss & Drop, but not to any employees who were afforded direct access to the Shell Cracker Plant. For that reason, the Court will re-form Valentic's proposed class and

limit it to those nonexempt employees who were employed by Brock at the relevant time who worked more than forty hours in one or more weeks during which time they used the park & ride or Kiss & Drop for access to and departure from their jobsites, but excluding those employees who were afforded direct access to the Shell Cracker Plant.

C.    Typicality

Having determined that Valentic has shown numerosity, commonality, and predominance, the Court now assesses whether the "claims or defenses of the representative parties are typical of the claims or defenses of the class" pursuant to Rule 23(a)(3). When evaluating a potential class representative and class for typicality, the Court examines the individual(s) seeking to represent a proposed class of persons, here Valentic, to determine whether he is "sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation— so that certifying [such individual(s)] to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009). In assessing typicality, the courts "consider the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class," focusing on "the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to [his or] her claims." *Id.* at 597-98.

Valentic argues that he is typical of the class he seeks to represent in this litigation. He argues that he and all others followed the same rules for Brock employees at the Shell Cracker Plant; thus, he says, his representation of the class is fair to those whose interests he will represent. Brock counters that Valentic has not met his burden at this stage to demonstrate that the factual circumstances underlying his claims are the same as the factual circumstances underlying the

17

claims of the others in his purported class. In particular, Brock contends that its employees on site at the Shell Cracker Plant during the relevant time all engaged in different activities with respect to whether they used the park & ride system, whether they donned and doffed PPE at home or onsite, and when they arrived at jobsites. That is, Brock argues that Valentic's experience of using the Blue Lot and the Green Lot, taking the bus to the Shell Cracker Plant, and donning/doffing PPE onsite is not typical of the other members of his putative class. And, Brock argues, Valentic has no way of knowing how many of his coworkers had the same experience as he did; therefore, his claims cannot be typical of the class.

The threshold for typicality is low. In *Nat'l Football League Players Concussion*, the Third Circuit explained that it would certify a class of former professional football players despite distinctions among them such as number of seasons they had played and their respective injuries because "[e]ven if the class representatives' injuries are unique to their time in football, the NFL's alleged fraudulent concealment of the risks of head injuries is the same." 821 F.3d at 428. That is, the defendant's alleged wrongful conduct and the injury—on some level—was consistent among those in the proposed class. Likewise here, the alleged wrongful conduct and the injuries among the proposed class are sufficiently similar to the violation of the PMWA alleged by Valentic and his alleged injuries. Valentic, having used the park & ride system to access his jobsite, is most typical of other Brock employees who used the park & ride system. The park & ride employees could be distinguished from the Kiss & Drop employees because the latter may have been more likely than the former to spend less than the thirty-to-forty minutes they were paid at the end of the day in getting to and from their jobsites. However, because there is no *de minimis* exclusion from hours worked under the PMWA—as discussed *supra*—the Court finds that Valentic's claim is typical of not only those employees who used the park & ride system, but also those employees

18

who used the Kiss & Drop such that he is an appropriate representative of the proposed class (as narrowed by the Court). *Nat'l Football League Players Concussion*, 821 F.3d at 428 ("Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." (quoting *Prudential Ins. Co.*, 148 F.3d at 311) (cleaned up))).

      D.    <u>Adequacy of Representation</u>

      Rule 23(a)(4) "tests the qualifications of class counsel and the class representatives" and "aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations." *Nat'l Football League Players Concussion*, 821 F.3d at 428. Valentic argues that he meets both measurements of adequacy: his attorneys are experienced and well-qualified to handle this litigation and he has no interests that undercut the interests of the proposed class. Brock argues that because Valentic cannot establish the other Rule 23(a) requirements of numerosity, commonality, or typicality, he cannot perforce show that he can represent his proposed class adequately. Because this Court has found that numerosity, commonality, and typicality are satisfied, the Court finds Brock's argument against adequacy of representation to be unpersuasive. Moreover, the Court has no reason to believe that Valentic's attorneys are not "qualified, experienced, and generally able to conduct the proposed litigation." *Smith v. Strom Eng'g Corp.*, No. CV 19-147, 2022 WL 2668558, at *7 (W.D. Pa. May 10, 2022) (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975)).

      Counsel for Valentic have submitted declarations in support of their qualifications to handle complex wage and hour class actions, and have declared under penalty of perjury that they have thoroughly investigated the claims in this complaint and that they are, among other things, prepared to advance all costs needed for the prosecution of this action. (Docket No. 59, Ex. 7).

Regarding adequacy as to Valentic, courts have generally found that "[w]hen Plaintiffs have 'communicated with their lawyers, reviewed filings prior to their submission to the Court, and have aided counsel to discovery requests' and 'shown a basic understanding of the facts and claims underlying the litigation,' the adequacy prong is met." *Vrakas v. United States Steel Corp.*, No. CV 17-579, 2019 WL 7372041, at *6 (W.D. Pa. Dec. 31, 2019) (quoting *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *10 (E.D. Pa. Aug. 4, 2016)). Counsel for Valentic have indicated under penalty of perjury that Valentic has assisted his attorneys in the pursuit of this case, "has no conflicts with counsel or, to [counsel's] knowledge, the Putative Class," and "has a firm understanding of the basic nature of the claims in this case and the relevant facts." (Docket No. 59, Ex. 7). Based on the foregoing, the Court is satisfied that adequacy is met under Rule 23(a)(4).

      E.      <u>Rule 23(b)(3) Requirements</u>

All Rule 23(a) requirements being satisfied, the Court must now determine whether Rule 23(b)(3)'s predominance, superiority, and ascertainability requirements are satisfied. *Strom Eng'g*, 2022 WL 2668558, at *8. The Court has herein already addressed and found predominance and will proceed to superiority. Superiority "requires that class treatment be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 408-09 (3d Cir. 2015) (quoting Rule 23(b)(3)). Factors that help determine superiority include: "the class members' interest in individually controlling the prosecution of separate actions; the extent and nature of any similar litigation already commenced by class members; the desirability of concentrating the litigation in a particular forum; and the difficulties likely to be encountered in the management of a class

action." *Id.* (quoting Rule 23(b)(3)).  Efficiency and manageability are key concerns.  *Newton*, 259 F.3d at 191.

Valentic argues that there are no other pending actions raising the same claims against Brock individually which shows the members of the proposed class lack interest in controlling their individual claims, and Valentic further argues that one class action would be a more efficient exercise of judicial resources than allowing potentially hundreds of Brock employees to individually file suit against Brock.  Brock contends that the need for mini-trials to determine damages (on the backend) totally undermines the purported efficiency of a class action here.  Brock argues that because there is no unlawful policy or practice being challenged, for each Brock worker the Court will have to consider evidence of whether that worker used the park & ride services or the Kiss & Drop, why they used those services (*i.e.*, for their own convenience or as part of their duties), whether they were provided additional compensation beyond the first forty-minutes' worth of compensation if they missed the first wave of buses, and how much time was actually uncompensated taking into account the extra forty minutes employees were paid beyond the stop-work time.

However, while there will be individual issues in this case, the Court disagrees with Brock's argument that there is no central policy or practice at issue here.  The Court's analysis above shows that there *is* a policy or practice common to the entire class that the Court ought to factor into its superiority decision, that is: whether time that employees spent *en route* from the parking lots and the Kiss & Drop, through the lunch tents, to the jobsites, and back again at the end of the day constituted "hours worked" under the PMWA.  This Court has already found that the requirements of commonality and predominance are satisfied, which counsels this Court that even though there will be individualized questions about the class members' pre- and post-shift

21

activities, the amount of difficulty posed thereby is not so much that this class action should be said to be unmanageable. *See Villa v. Cargill Meat Sols. Corp.*, No. 3:22-CV-1321, 2024 WL 4374958, at \*15 (M.D. Pa. Oct. 2, 2024) (finding that, commonality and predominance being satisfied, the Court would also find that the individual issues related to litigation could be managed).

Finally, the Court must consider whether Valentic's proposed class (as modified *supra*, Section III.B.) is ascertainable. "The ascertainability requirement as to a Rule 23(b)(3) class is consistent with the general understanding that the class-action device deviates from the normal course of litigation in large part to achieve judicial economy." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015), *as amended* (Apr. 28, 2015). Ascertainability as an independent requirement "ensures that a proposed class will actually function as a class. This understanding of the source of the ascertainability requirement takes a forward-looking view of the administration of the Rule 23(b)(3) class-action device in practice." *Id.* To demonstrate ascertainability, the plaintiff seeking certification of a Rule 23(b)(3) class must "show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* at 163 (quoting *Hayes*, 725 F.3d at 355). The thrust of the ascertainability inquiry is whether class members "*can be identified.*" *Id.* at 164 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n. 2 (3d Cir. 2013)), 165 ("The separate ascertainability requirement ensures that class members can be identified after certification[.]"). There is no requirement of records; however, a plaintiff seeking certification of a class "cannot merely provide assurances to the district court that it will later meet Rule 23's requirement" or "propose a method of ascertaining a class without" showing that "the method will be successful." *Id.* (quoting *Carrera*, 727 F.3d at 306, 307, 311).

Valentic argues that there are objective criteria that serve to define his class, that is: the class is limited to Brock employees who received no overtime for pre- and post-shift work activities.  As for a reliable and administratively feasible method of delineating who is in or out of the class, Valentic argues that Brock's payroll records and security badge swipe data can be used unto that end.  That is, the class is identifiable by looking at Brock employees' swipes at the parking lots, Kiss & Drop, and lunch tents to determine whose hours worked exceeded their hours paid.  Brock's challenge to ascertainability is rolled into its other arguments concerning the difficulty of identifying class members without "hundreds, if not thousands, of mini-trials for determination of both liability and damages" to determine things like use of off-site lots, which lot was used, whether class members were on Shell Cracker Plant premises for their own convenience, when class members were released from job assignments, etc."  (Docket No. 61 at 23).[6]

The Court has explained, ascertainability demands only that the class *can* be identified.  In this instance the Court is satisfied that at least for those members of a narrowed class who were not authorized to directly access the Shell Cracker Plant—*i.e.*, were of necessity using either the park & ride system or the Kiss & Drop—security badge records will provide an adequate method of identifying class members.

## IV.    CONCLUSION

For the foregoing reasons, the Court will partially grant Valentic's motion and certify the following class, narrowed slightly from the class certification that was requested by Valentic: all non-exempt employees presently or formerly employed by Defendants at the Pennsylvania Petrochemicals Complex (aka "Shell Cracker Plant") at any time during the period from November

---

[6]    *See* Docket No. 61 at 14 n. 5 ("As many of the strict requirements of Rule 23(a) and Rule 23(b)(3) conceptually overlap, those requirements are addressed together to avoid repetitive argument.").

3, 2018, through the present who worked more than forty hours in at least one work week and who were not authorized to access the Shell Cracker Plant directly, and therefore used the park & ride system or the Kiss & Drop.  An Order consistent with this Memorandum Opinion shall issue.


*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated:  March 18, 2025

cc/ecf:  All counsel of record